UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SAMUEL LEE JOHNSON, JR.,

       Plaintiff,

vs.                                                       CASE NO. 3:07-cv-756-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____

## ORDER AND OPINION

This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") and supplemental security income payments ("SSI"). Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated January 10, 2008 (Doc. #13). The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the undersigned in making his determinations.

Accordingly, the instant matter has been decided on the written record. For the reasons set out herein, **the Commissioner's decision is AFFIRMED**.

## I. Procedural History

Plaintiff filed applications for DIB and SSI on March 3, 2004 (Tr. 67-69, 412-16). Plaintiff claimed a disability onset date of December 14, 1997 (Tr. 67, 412).[1] A hearing was held on May 11, 2006 before Administrative Law Judge Robert Droker (the "ALJ")—at which, Plaintiff appeared and testified and was represented by attorney Herbert Sussman (Tr. 437-62).

After reviewing the medical evidence of record and hearing testimony at the May 11, 2006 hearing, the ALJ issued an unfavorable decision on June 7, 2006 (Tr. 13-24). On June 20, 2007, the Appeals Council denied review of the ALJ's June 7, 2006 decision, which became the Commissioner's final decision (Tr. 6-8). Plaintiff now seeks the Court's review of the ALJ's unfavorable decision (Doc. #1).

## II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).

For purposes of determining whether a claimant is disabled, the law and regulations governing a claim for disability benefits are identical to those governing a claim for supplemental security income benefits. *Patterson v. Bowen*, 799 F.2d 1455, 1456, n. 1

---

[1]Plaintiff met the insured status requirements for Title II benefits for the time period between December 14, 1997 and December 31, 2002 (Tr. 72).

2

(11th Cir. 1986). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(i-v); 416.920(a)(4)(i-v)[2]; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67

---

[2]All references made to 20 C.F.R. will be to the 2008 edition unless otherwise specified.

F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations. 20 C.F.R. §§ 404.704; 416.912(c).

## III. Background Facts

Plaintiff was born on October 23, 1960, completed high school, and has past work experience as a sandblaster and painter (Tr. 67, 116, 124-25, 443, 456). Plaintiff alleges he became disabled on December 14, 1997 due to a bulging lumbar disc and knee/leg problems (Tr. 115, 442).

In June 1996, Plaintiff participated in physical therapy for symptoms of lumbar strain, and on September 29, 1997, E. Edward Franco, M.D. ("Dr. Franco"), performed a magnetic resonance imaging examination ("MRI") of Plaintiff's lumbar spine (Tr. 144, 188-97). Dr. Franco's impression was that a mild bulge of the annulus appreciated at the L3-4 and L4-5 levels (Tr. 144). Additionally, on December 4, 1997, Dr. Franco performed an MRI on Plaintiff's left knee, which revealed a tear of Plaintiff's medial meniscus (Tr. 142).

On December 15, 1997, John Lovejoy, Jr., M.D. ("Dr. Lovejoy"), examined Plaintiff for left knee pain and popping in the right knee (Tr. 249-51). Dr. Lovejoy reviewed Plaintiff's previous MRI and took an x-ray to uncover a possible loose body in Plaintiff's knee (Tr. 249). Dr. Lovejoy suggested arthroscopic surgery (Tr. 250). On an Authorization for Medical Evaluation form provided to Plaintiff's employer, Dr. Lovejoy indicated Plaintiff could return to modified work on December 16, 1997 so long as that work did not involve climbing, bending, stooping, squatting, or prolonged standing or walking (Tr. 251).

On January 14, 1998, Dr. Lovejoy performed arthroscopic debridement of the left knee with partial medial meniscectomy (Tr. 244). On January 23, 1998, Plaintiff presented at Dr. Lovejoy's office with complaints of exquisite pain in his knee, and he was prescribed Lortab for pain (Tr. 248). On January 27, 1998, Dr. Lovejoy performed arthroscopic debridement and lavage of Plaintiff's left knee (Tr. 241-42).

5

From February to May 1998, C. Earl Eye, Jr., M.D. ("Dr. Eye"), treated Plaintiff for knee infection (Tr. 176-80). Dr. Eye noted that Plaintiff failed to attend follow-up appointments and did not perform his prescribed exercises (Tr. 178, 180).

On June 17, 1998, Dr. Lovejoy reported that Plaintiff's knee was much better, yet Plaintiff still experienced some catching and popping inside his knee (Tr. 239). The doctor suggested vocational rehabilitation for re-training in a job that did not require bending, climbing, or heavy lifting (Tr. 239).

On November 2, 1998, Dr. Lovejoy examined Plaintiff in relation to continued knee pain (Tr. 221). He noted Plaintiff's quadriceps atrophy, decreased range of motion, and antalgic gait that required the use of a cane (Tr. 221). Dr. Lovejoy remarked that Plaintiff had plateaued in therapy, needed to be retrained into another job field, and was encouraged to continue exercising and riding his bicycle (Tr. 221).

On December 4, 1998, Plaintiff returned to Dr. Lovejoy's office and stated he experienced pain with walking any distance (Tr. 221). Dr. Lovejoy noted evidence of some popping and catching and a minimal joint effusion (Tr. 221). Dr. Lovejoy recommended vocational rehabilitation and stated Plaintiff had reached maximum medical improvement and would continue to have problems with his knee (Tr. 221).

On November 17, 1999, Plaintiff presented at Shands Jacksonville ("Shands") for chronic knee pain (Tr. 389). The physical examination revealed that Plaintiff was positive for an antalgic gait pattern, yet Plaintiff did not use a cane (Tr. 389). The examining physician noted that Plaintiff was in no apparent distress and had no knee swelling, but Plaintiff had some knee tenderness and limited range of motion (Tr. 389). On November 24, 1999, Plaintiff's knee was x-rayed, and the examining physician, Samuel Agnew, M.D.

6

("Dr. Agnew"), recommended high tibial osteotomy and artroscopic surgery (Tr. 368, 388).

On September 19, 2001, Plaintiff underwent a consultative examination with state agency medical examiner Timothy J. McCormick, D.O. ("Dr. McCormick") (Tr. 252-55). Plaintiff presented with complaints of back pain and pain about the left knee, which occurred when walking or standing (Tr. 252-53). Plaintiff described the knee pain as "subtle" and indicated that the back pain only bothered him when his knee hurt and when he stood for too long (Tr. 252-53). Dr. McCormick told Plaintiff that he would benefit from vocational rehabilitation, and Plaintiff indicated that he was pursuing other work, such as computer work (Tr. 255). Lastly, Dr. McCormick told Plaintiff that he would be better suited for bench type work or work where he is not involved in prolonged sitting or standing (Tr. 255).

On February 19, 2002, Malcom Foster, Jr., M.D. ("Dr. Foster"), wrote a general letter stating that he examined Plaintiff in 1999 and started him on antidepressant and antianxiety medications (Tr. 266). Dr. Foster indicated that Plaintiff suffered from chronic pain resulting from knee surgery that was complicated by a major infection (Tr. 266).

On May 21, 2004, Plaintiff underwent a physical examination with consultative medical examiner Thao X. Le, M.D. ("Dr. Le") (Tr. 268-72A). Plaintiff complained of chronic elbow pain that began in 1998 after he started using a walking cane (Tr. 268). The pain was aching and sharp in character and radiated into his shoulder (Tr. 268). Additionally Plaintiff complained of chronic, sharp back pain that began in 1997 and radiated into his hips and legs at all times (Tr. 268). Furthermore, Plaintiff complained of chronic sharp knee pain that began in 1997, and which radiated into his back and was accompanied by grinding, popping, and swelling (Tr. 268).

Dr. Le's examination revealed that Plaintiff had some difficulty getting on and off the exam room table and in and out of the exam room chair (Tr. 270). Plaintiff was unable to lift 20 pounds with both hands and ambulated with a limping gait (Tr. 271). Plaintiff experienced no pain or loss of range of motion of the thoracic or cervical spine in sitting or supine position; however, he did experience pain, with no loss of range of motion, of the lumbar spine (Tr. 271). Plaintiff's lower extremities were normal in shape; however, Plaintiff experienced pain with limited range of motion and pain when squatting 1/4 way (Tr. 271). Plaintiff could perform tandem, toe heel walking with difficulty, and could walk 30 feet without the quadruple pod cane he brought to the examination (Tr. 271).

On November 4, 2004, Lauren Lucas, Ph.D. ("Dr. Lucas"), psychologically evaluated Plaintiff (Tr. 281-83). Plaintiff rated his typical medicated pain level as eight on a ten point pain scale, with ten being the highest threshold of pain (Tr. 281). He walked with a pronged cane, demonstrated significant pain behaviors, and reported that he spent his days reading and watching television (Tr. 281-82). Plaintiff stated he had no hobbies and did not socialize, cook, do housework, or do laundry (Tr. 282). Plaintiff indicated that he attended church occasionally (Tr. 282). Dr. Lucas reported that Plaintiff appeared psychologically competent to perform a routine repetitive task and to appreciate the need for appropriate relations among co-workers and supervisors (Tr. 282).

On November 13, 2004, John Canterbury, M.D. ("Dr. Canterbury"), examined Plaintiff (Tr. 298-301). Dr. Canterbury noted that Plaintiff was able to perform most activities of daily living, including dressing and feeding himself; stand at any one time for about 20 to 30 minutes; walk on level ground with the assistance of a cane for about 25-30 yards; sit in any one position for about 30 minutes; lift moderately heavy objects; and

8

perform light household chores (Tr. 298). Additionally, Dr. Canterbury reported that Plaintiff ambulated with a left-sided limp, but would only ambulate with the assistance of a cane (Tr. 299). Dr. Canterbury stated Plaintiff did not want to attempt to ambulate without the cane, yet he believed a best effort would allow Plaintiff to take a few steps without the cane (Tr. 299). Furthermore, Plaintiff was able to get on and off the exam room table and up and out of a chair without assistance (Tr. 299). Lastly, Dr. Canterbury noted, *inter alia*: (1) Plaintiff seemed to have real knee pain; (2) some findings on the medical exam supported Plaintiff's claim that he could not ambulate without a cane; (3) Plaintiff was able to handle objects; and (4) Plaintiff could sit, stand, and walk with limitation secondary to knee pain (Tr. 300).

On December 13, 2004, state agency medical consultant, Eric Puestow, M.D. ("Dr. Puestow"), performed a Physical Residual Functional Capacity ("RFC") assessment of Plaintiff (Tr. 302-09). Dr. Puestow reported Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk at least two hours in an eight-hour workday with the use of a monopolar cane, and sit for about six hours in an eight-hour workday (Tr. 303). Dr. Puestow opined that Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but should not climb ladders, ropes, or scaffolds (Tr. 304). Dr. Puestow remarked that Plaintiff's left knee pain was likely credible and supported by data; however, he stated that there were "no objective correlates regarding other pain allegations" (Tr. 307).

On May 19, 2005, Plaintiff presented to the orthopedic clinic at Shands with complaints of continued knee pain and difficulty walking (Tr. 335). Michael Patney, D.O. ("Dr. Patney"), discussed the possibility of total knee replacement with Plaintiff, and on August 2, 2005, Plaintiff underwent a total knee replacement surgery on his left knee (Tr.

9

336, 394, 397, 451). From September to December 2005, Plaintiff participated in physical therapy (Tr. 311-34).

On January 5, 2006, Plaintiff returned to Shands for evaluation of his knee (Tr. 397). Plaintiff walked with a cane and showed limited motion of the left knee (Tr. 397). An x-ray revealed that the left knee demonstrated a well-fixed total knee arthroplasty with satisfactory alignment of the prosthesis (Tr. 397). Plaintiff indicated that he stopped doing his home physical therapy after being discharged from physical therapy in December 2005 (Tr. 397). During this visit, Plaintiff was prescribed additional physical therapy (Tr. 397).

On February 8, 2006, Dr. Foster saw Plaintiff for a follow-up visit (Tr. 409). Plaintiff complained of ankle swelling and numbness, tingling, and burning of the left knee (Tr. 409). His level of pain was a six on a ten point pain scale (Tr. 396). Dr. Foster referred Plaintiff to three months of physical therapy (Tr. 409).

On April 6, 2006, Plaintiff returned to Shands for knee evaluation (Tr. 394). Dr. Patney noted Plaintiff had no problems except slight decreased range of motion (Tr. 394). Dr. Patney reported that Plaintiff had improved his range of motion in the past three months and was happy with his improvement (Tr. 394). Plaintiff's knee was nontender to palpation, but Plaintiff stated he experienced a pulling aspect on both medial and lateral sides of the patella with prolonged sitting (Tr. 394). X-rays revealed that the left knee demonstrated a well-fixed total knee arthroplasty with normal alignment and components without evidence of loosening or lysis (Tr. 394). Plaintiff was encouraged to continue weight bearing as tolerated, and Dr. Patney indicated he would refill Plaintiff's prescription for physical therapy in three months (Tr. 394).

On May 11, 2006, Plaintiff appeared and testified at the administrative hearing (Tr. 437-62). Plaintiff stated that he finished the twelfth grade but had not received any additional training or education (Tr. 441). Plaintiff stated that he tried vocational rehabilitation but was unable to work due to leg and back pain (Tr. 442). Plaintiff reported his leg swelled with walking, and that his back hurt if he walked or sat too long (Tr. 442). Plaintiff additionally testified that he took medication for his pain symptoms, experienced relief sometimes, and experienced no side effects (Tr. 442-43).

Plaintiff described his daily activities as sitting at home watching television, reading and assisting with his children (Tr. 444). Plaintiff testified that he, his wife, and children all performed the household chores (Tr. 444). Plaintiff stated that he periodically cooked and washed dishes, but that he did not do laundry, make his bed, vacuum, mop, or do any yard work (Tr. 444-45). Plaintiff reported that he read his Bible about one to one-and-a-half hours per day, watched television for approximately two hours per day, and periodically listened to the radio (Tr. 446). Plaintiff stated he helped his children with their homework and grocery shopped with his wife about twice monthly (Tr. 447-48). Plaintiff stated he went to church every Sunday but otherwise had no social life (Tr. 448).

Plaintiff testified that his knee swelled and popped even after the total knee replacement surgery (Tr. 451). Plaintiff stated his knee buckles and gives way, which is why he uses a cane to help him keep his balance (Tr. 452). Plaintiff further testified that he went to physical therapy three times per week (Tr. 452). Plaintiff stated that he weighed 263 pounds, and that such weight was normal for him (Tr. 441).

Pursuant to examination by his attorney, Plaintiff testified that he was able to walk a couple of blocks before needing to rest (Tr. 453). Plaintiff stated that he experienced

abdominal pain following a hernia surgery, experienced headaches, and that Dr. Foster was his primary care physician (Tr. 453). Plaintiff stated that he did not lift more than 10 pounds per his doctor's instructions (Tr. 454). Plaintiff testified that his left knee range of motion was still only about half of what it should be (Tr. 455).

Vocational Expert Mark Capps (the "VE") appeared at the hearing and testified that the *Dictionary of Occupational Titles* ("DOT") classifies Plaintiff's past work as a sandblaster as medium exertional level work with a Specific Vocational Preparation ("SVP") skill level of two[3] (Tr. 456). Additionally, the VE testified that the DOT classifies Plaintiff's other previous work as a painter, structural steel, as heavy exertional work with an SVP of level four[4] (Tr. 456).

The ALJ posed three hypothetical questions to the VE in order to determine whether an individual with Plaintiff's RFC could perform Plaintiff's past relevant work (Tr. 456-58). The ALJ's first hypothetical claimant was 45-years old, had a high school education, and could perform light work, but needed a sit/stand option, needed to avoid ladders or unprotected heights, needed to avoid the operation of heavy moving machinery, needed to avoid unusual stress, needed a monopolar cane in ambulation, needed to avoid the operation of foot controls with the left leg, could occasionally bend and crouch, but needed to avoid kneeling, stooping, squatting, or crawling (Tr. 456-57). The VE testified that, given the restrictions posed, the hypothetical claimant would be restricted from performing any of his past relevant work (Tr. 457).

---

[3]Pursuant to SSR 00-4p, occupations with an SVP of two are considered unskilled occupations. SSR 00-4p 2000 WL 1898704, at *3 (S.S.A. December 4, 2000).

[4]Pursuant to SSR 00-4p, occupations with an SVP of four are considered semi-skilled occupations. SSR 00-4p 2000 WL 1898704, at *3 (S.S.A. December 4, 2000).

The ALJ's second hypothetical considered the limitations posed in the first hypothetical; however, the second hypothetical was restricted to entry-level work, and the claimant was assumed to have no skills or semi-skills (Tr. 457). The VE testified that the DOT lists occupations within the second hypothetical at both the light and sedentary job categories (Tr. 457-58). The first job title was ticket seller, which was in the light category with an SVP of two (Tr. 457). The VE testified that there were 17,000 positions in the regional economy and 289,000 positions in the national economy (Tr. 457). The second job title was warehouse checker, which also was in the light category with an SVP of two (Tr. 457). The VE testified that there were 4,200 positions regionally and 78,000 in the national economy (Tr. 457). The third job title was table worker, which was in the sedentary category with an SVP of two (Tr. 457-58). The VE stated that 3,500 positions existed regionally and 126,000 existed in the national economy (Tr. 458). The last job title was order clerk, food and beverage, also in the sedentary category with an SVP of two (Tr. 458). The VE indicated that 4,700 positions existed regionally and 82,000 in the national economy (Tr. 458).

In hypothetical three, the ALJ focused on the ticket seller and warehouse checker occupations and added a 10-pound maximum weight lift limitation to the limitations enumerated in the prior hypotheticals (Tr. 458). The VE testified that those two jobs would not be eliminated by the additional limitation and that they could be performed sitting or standing (Tr. 458).

In his opinion denying Plaintiff's disability claim, the ALJ determined that Plaintiff had the RFC to perform light or sedentary work with a 10-pound maximum weight lift; needed a sit-stand option; should avoid ladders, unprotected heights, operation of heavy moving

machinery, unusual stress, operation of foot controls with his left leg, kneeling, stooping, squatting, or crawling; could occasionally bend and crouch; and needs a monopolar cane for ambulation (Tr. 19, Finding 5).

The ALJ relied on the testimony of the VE and determined at Step 5 of the sequential evaluation process that Plaintiff was not disabled pursuant to the Regulations because there were significant jobs in the economy that Plaintiff could perform despite his limitations (Tr. 23-24, Findings 10-11).

### IV. Analysis

**A.     Whether the ALJ Improperly Discounted Plaintiff's Subjective Complaints of Pain**

Plaintiff first argues that the ALJ improperly discounted his subjective complaints of pain and failed to properly assess his credibility (Doc. #19 at 4). For the reasons stated below, the undersigned is not persuaded by this argument.

When considering Plaintiff's credibility, pain and subjective symptoms alone can be impairments which result in a claimant being disabled. *Marbury v. Sullivan*, 957 F. 2d 837, 839 (11th Cir. 1992). A reviewing court decides whether the Commissioner's findings are consistent with the proper legal standard and are supported by substantial evidence. *Bridges v. Bowen*, 815 F. 2d 622, 624-25 (11th Cir. 1987). 42 U.S.C. § 423 (d)(5)(A) sets forth the conditions by which a claimant's subjective symptoms of pain may establish a disability.

The Eleventh Circuit has interpreted the aforementioned statute to require the Commissioner to consider a claimant's subjective testimony if the claimant has established: (1) evidence of an underlying medical condition; and either (2) objective medical evidence

14

that confirms the severity of the alleged pain or restrictions arising from that condition, or (3) evidence that the objectively determined medical condition is such that it can be reasonably expected to give rise to the claimed pain or restriction. *Foote*, 67 F.3d at 1560-61; *Marbury*, 957 F. 2d at 839; *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991).

While the ALJ must consider a plaintiff's subjective testimony regarding pain that restricts his or her ability to work, the ALJ may reject the testimony as not credible and such a determination will be reviewed under the substantial evidence standard. *Marbury*, 957 F.2d at 839. Furthermore, the ALJ's determinations as to the credibility of a plaintiff will not be overturned if, reviewing the entirety of the record, there is substantial evidence supporting a finding of non-credibility. *Foote*, 67 F. 3d at 1562.

In the instant case, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, duration, and limiting effects of those symptoms were not entirely credible (Tr. 20). The ALJ gave multiple reasons why he discredited Plaintiff's subjective complaints of pain and questioned Plaintiff's credibility (Tr. 20-22).

As a preliminary matter, Plaintiff takes issue with the fact that the ALJ questioned Plaintiff's credibility by noting that Plaintiff gained weight despite being advised to lose weight (*see* Doc. #19 at 17-18; Tr. 21, 391, 441).[5] The ALJ theorized that Plaintiff's symptoms may not have been as severe as alleged if Plaintiff chose not to make an effort to alleviate symptoms for which he could effect a change (Tr. 21). The undersigned agrees

---

[5]During an August 31, 1999 follow-up examination, Dr. Foster recorded Plaintiff's weight as 253 pounds and advised him to lose weight (Tr. 391).

with Plaintiff that the fact Plaintiff gained weight perhaps should not have been used by the ALJ to discredit Plaintiff's pain testimony, especially since Plaintiff's weight gain could be attributed to any number of factors (*see* Doc. #19 at 17-18). The undersigned finds the ALJ's conjecture in this regard, however, does not constitute reversible error. The ALJ's comment regarding Plaintiff's weight gain was just one of many reasons cited by the ALJ to discredit Plaintiff's testimony regarding the persistence and intensity of the alleged pain. As discussed below, the undersigned finds the numerous other reasons cited by the ALJ to discredit Plaintiff's credibility are supported by substantial evidence of record (*see* Tr. 20-22).

First, the ALJ stated that Plaintiff's statements were in excess of the medical signs and laboratory findings (Tr. 20). The ALJ notes that Plaintiff's knee replacement surgery on August 2, 2005 was successful (Tr. 20). Specifically, the ALJ points to medical records that show, subsequent to the surgery, Plaintiff had no problems except slight decreased range of motion; Plaintiff demonstrated increased leg strength; and Plaintiff was able to ambulate far without difficulty (Tr. 20, 314-17, 394). Second, the ALJ points out that, prior to the left knee replacement, Plaintiff reported to Dr. Canterbury that he was able to perform most activities of daily living; stand at any one time for 30 minutes; walk 25-30 yards with the assistance of a cane; sit in any one position for about 30 minutes; lift moderately heavy objects; and perform light household chores (Tr. 20, 298).

Third, the ALJ observed that the rehabilitation progress notes further corroborate the clinical and laboratory findings (Tr. 20). Specifically, in 1998, Plaintiff reported that his knee was doing much better and that he only occasionally required Tylenol 3 for pain (Tr. 238). Plaintiff further reported that during physical therapy, he experienced a pain level of four

16

on a ten point scale, and that during several more recent outpatient physical therapy sessions, he demonstrated a pain level of zero on a ten point scale (Tr. 20, 186, 313-17).

Fourth, the ALJ specifically questioned Plaintiff's credibility by pointing to Plaintiff's failure to adhere to professional advice (Tr. 21). Dr. Eye, the physician who treated Plaintiff for his knee infection, documented that Plaintiff failed to attend follow-up appointments and did not perform his prescribed exercises (Tr. 178, 180).[6] Additionally, the ALJ found Plaintiff's activities of daily living were inconsistent with his allegations of debilitating pain (Tr. 21). In this regard, Plaintiff testified that he cooked occasionally, washed dishes, drove his children to and from school, helped his children with homework, went grocery shopping, attended children's activities, and went to church (Tr. 21, 282, 447-49). *See* 20 C.F.R. §§ 404.1529; 416.929 (pattern of daily living is an important indicator of the intensity and persistence of symptoms).

Fifth, the ALJ pointed to Dr. Lovejoy's opinion that Plaintiff could return to light and sedentary jobs, and that Plaintiff could sit for eight hours; stand four hours; walk one quarter mile; frequently lift 10 pounds; and occasionally lift 20 pounds (Tr. 22, 216-20, 222-25, 228, 230-36). Sixth, the ALJ considered the state agency medical consultants' opinions that notwithstanding credible knee pain allegations, Plaintiff was capable of lifting and/or carrying 20 pounds occasionally; lifting and/or carrying 10 pounds frequently; sitting six hours; standing four hours; and occasionally pushing and/or pulling with the left lower extremity (Tr. 273-78, 302-09).

---

[6]In addition, the undersigned notes the record evidence reflects that from October 2002 through May 2004, Plaintiff did not seek medical treatment (*see* Tr. 346-56).

If an ALJ gives at least three reasons for discrediting a plaintiff's subjective complaints of pain, a court may find the ALJ properly discredited the subjective pain testimony. *See Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th Cir. 1989). Here, the undersigned finds the aforementioned reasons cited by the ALJ are supported by substantial evidence of record. Accordingly, and for the aforementioned reasons, the undersigned finds the ALJ properly discredited Plaintiff's subjective complaints of pain.

**B.     Whether the ALJ Failed to Properly Consider and Address Plaintiff's Allegation of Difficulty With Prolonged Sitting**

Plaintiff's second argument is that the ALJ failed to properly consider and address Plaintiff's allegation of difficulty with prolonged sitting (Doc. #19 at 20). For the reasons stated below, the undersigned finds said argument has no merit.

As a preliminary matter, the undersigned is unable to identify anywhere on page 19 of the transcript where the ALJ concluded "Plaintiff does not have any limitations of the ability to sit," as alleged and cited by Plaintiff (Doc. #19 at 20). Notwithstanding the foregoing, the ALJ did not reject Plaintiff's allegation of difficulty with prolonged sitting and specifically found Plaintiff would need a sit/stand option to perform either sedentary or light work[7] (Tr. 19, Finding 5). In support of his determination that Plaintiff needed a sit/stand option, the ALJ pointed to Plaintiff's testimony that his legs and back hurt if he walked or *sat* too long (Tr. 19, 442) (*emphasis added*). Additionally, the ALJ determined Plaintiff required a sit/stand option despite Dr. Lovejoy's evaluation that Plaintiff could sit for 8 hours

---

[7]Plaintiff places great emphasis on the ALJ's failure to directly address Dr. McCormick's statement that Plaintiff would be better suited for work where he is not involved in prolonged sitting or standing (Doc. #19 at 20-21; Tr. 255). The undersigned disagrees with Plaintiff's contention that the ALJ rejected Dr. McCormick's opinion. Dr. McCormick effectively recommended work with a sit/stand option, and this is in accordance with the ALJ's determination that a sit/stand option is necessary (Tr. 255).

a day with breaks every two hours (Tr. 22, 228).

The ALJ also considered Plaintiff's inability to perform prolonged sitting when he included the need for a sit/stand option in the hypothetical questions posed to the VE (Tr. 456-59). In response, the VE identified specific light and sedentary jobs Plaintiff would be able to perform with a sit/stand option, and notably represented that the ticket seller and warehouse checker jobs could be performed sitting or standing (Tr. 457-58).

Based on the foregoing, the undersigned finds the ALJ properly considered and addressed Plaintiff's allegation of difficulty with prolonged sitting.

## V. Conclusion

Review of the record as a whole reveals substantial evidence supports the ALJ's finding of non-disability. Accordingly, and for the reasons stated herein, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this ruling and, thereafter, to close the file. Each party shall bear its own fees and costs.

**DONE AND ENTERED** at Jacksonville, Florida this 20th day of March, 2009.

Copies to:
Counsel of Record

*Thomas E. Morris*
**THOMAS E. MORRIS**
United States Magistrate Judge